## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ILKB, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CAMAC PARTNERS, LLC and KICKHOUSE | ) | **VERIFIED COMPLAINT** |
| FITNESS, LLC, JESSICA YARMEY, ERIC | ) | |
| SHAHINIAN, and DANIEL R. LANIER | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff ILKB, LLC ("ILKB"), by counsel, alleges for its Verified Complaint against Defendant Camac Partners, LLC ("Camac"), Kickhouse Fitness, LLC ("Kickhouse"), Jessica Yarmey ("Yarmey"), Eric Shahinian ("Shahinian"), and Daniel R. Lanier ("Lanier") (collectively, "Defendants") state as follows:

## PARTIES

1.    ILKB is a New York limited liability company that is owned and operated under the laws of New York with a principal place of business located at 1844 Lansdowne Avenue, Merrick, New York 11566.  All of the members of ILKB are residents of New York.

2.    Kickhouse is a Delaware limited liability company duly organized under the laws of the State of Delaware.  Kickhouse was registered on July 14, 2020 in the State of Delaware. Kickhouse's registered agent is located at 251 Little Falls Drive, Wilmington, DE 19808.

3.    Camac is a Delaware limited liability company duly organized under the laws of the State of Delaware.  Camac is located at 350 Park Avenue, 13th Floor, New York, NY 10022.

4.    Shahinian is an individual who resides in the State of New York.   Shahinian is the managing member of Camac and President and Owner of Kickhouse.

5.      Yarmey is an individual who resides in the State of Texas.  Upon information and belief, Yarmey is an equity owner in Kickhouse.

6.      Lanier is an individual who resides in the State of Maryland.  Upon information and belief, Lanier is an equity owner in Kickhouse.

## JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over Camac because it is a Delaware limited liability company and conducts business within the State of New York with offices located at located at 350 Park Avenue, 13th Floor, New York, NY 10022.

8.      This Court has personal jurisdiction over Kickhouse because it is a Delaware limited liability company and conducts business within the State of New York under franchise name "Kickhouse."

9.      This Court has personal jurisdiction over Shahinan, Yarmey, and Lanier who conduct business within the State of New York including through Camac and Kickhouse.

10.     This Court has original subject matter jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), as well as supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims under the DTSA.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, or a substantial part of property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

### The ILKB Franchise System

12.     ILKB is a franchisor of kickboxing studios located throughout the United States.

13.     ILKB is one of the largest kickboxing franchises in the United States.

14.     ILKB owns the registered ILKB ILOVEKICKBOXING® trademark (U.S. Registration Number  87394140) service marks, logos and derivations thereof ("Marks"), as well as the distinctive and well-known ILOVEKICKBOXING® system, which combines cardio, resistance training, technology, and proper diet to help meet its client's fitness goals and needs, and offers such services to the public under the Marks.

15.     The Marks consists of the term "ILKB" with the shape of a boxing glove placed over the right side of the letter "K" and the left side of the letter "B."  In smaller font, and below the term "ILKB" is the term "ILOVEKICKBOXING."

16.     ILKB advertises and promotes the Marks and ILKB system throughout the United States, and has invested substantial time and money to maintain and improve its franchise system, including, *inter alia*: (1) maintaining and developing service and product quality; (2) developing uniform designs and markings for its services; (3) licensing trademarks and other proprietary information to, and (4) training franchisees.

17.     As a result of these efforts and expenditures, the Marks have become associated in the minds of consumers with uniform goods and services of consistently high quality, provided only by persons following ILKB's approved sales, operating methods and procedures.

18.     ILKB grants licenses to franchisees to use its Marks and participate in its proprietary franchise system pursuant to written franchise agreements which are reasonably and carefully tailored to protect ILKB's valuable trade secrets, reputation, confidential information, Marks, goodwill, and other legitimate business interests.

19.     ILKB discloses confidential information, including proprietary methods of operation of its franchise system, customer information, and marketing information, to franchisees

through its confidential and proprietary operations manual ("Operations Manual") and other training manuals and programs.

20.     To protect its confidential information, ILKB restricts the use of the information and requires that its franchisees agree to certain procedures to protect the information.

21.     All ILKB franchisees agree that, upon expiration, termination, or nonrenewal of a franchise agreement, they will never use, disclose, or permit the use or disclosure of the ILKB's confidential information.

22.     Upon the termination of a franchise agreement, all former franchisees are required to stop using all literature and forms received from ILKB and to deliver to ILKB all customer information, all copies of the Operations Manual and all other confidential information and documents provided by ILKB and/or bearing the Marks.

23.     ILKB has grown to be one of the largest kickboxing franchises in the United States and plays an important role in local economies where its franchises operate.

**The Non-Disclosure Agreement**

24.     On or about January 22, 2020, Camac entered into a Non-Disclosure Agreement with ILKB to explore a business opportunity involving Camac's potential purchase of certain ILKB franchised assets.   A copy of the Non-Disclosure Agreement is attached hereto as **Exhibit A**.

25.     Shahinian, Managing Member, negotiated and executed the Non-Disclosure Agreement on behalf of Camac.

26.     ILKB insisted on the execution of the Non-Disclosure Agreement to protect its franchised interests, Marks and systems while it provided Camac and Shahinian with material non-public information including, but not limited to investment techniques, actual or anticipated

strategies, future initiatives, data and methodology (the "Confidential Information") during the due diligence phase of Camac's exploration and analysis of its potential purchase of certain ILKB assets.

27.    In particular, ILKB provided Camac with confidential information concerning its 200 franchisees, including Franchise Agreements, franchisee proprietary and personal information, lease information, and other pertinent and confidential information to demonstrate the viability of ILKB's franchise system.

28.    As franchisor, ILKB provided Camac with, among other things, confidential information and documents in its unique franchise operations and marketing, advertising and sales strategies, and business systems. Camac also received a copy of ILKB's confidential and proprietary operating, marketing, and advertising materials, including its Operations Manual, which are not available to anyone who is not part of ILKB's franchise system.

29.    To protect ILKB's interest, the Non-Disclosure Agreement specifically stated that ILKB did not wish to lose the confidentiality of or diminish the rights in its Confidential Information.  (*See*, Exhibit A ¶ 1).

30.    Based on the unequivocal terms in the Non-Disclosure Agreement, Camac agreed to (i) hold all Confidential Information provided to it by ILKB in confidence; (ii) use such Confidential Information only for the purpose of exploration and analyzing business opportunity of mutual interest; (iii) reproduce such Confidential Information only to the extent necessary for the parties' stated purpose; (iv) restrict disclosure of such Confidential Information to its employees, agents, consultants, representatives and attorneys.  (*See*, Exhibit A ¶ 2)

31.    Moreover, Camac represented and warranted that it would (i) use the Confidential Information for informational and internal use only to help evaluate the purpose of the agreement;

(ii) not distribute the Confidential Information to any third-party, including but not limited to customers, clients, potential investors, sales personnel, affiliates, or other institutions, (iii) not use any Confidential Information in any presentation of any kind, including but not limited to sales, marketing, investor, or other presentations.  (*See*, Exhibit A, ¶ 3).

32.     Camac also agreed to refrain from copying, duplicating, replicating or reconstructing, for its own purpose, ILKB's Confidential Information during the term of the Non-Disclosure Agreement.  (*See*, Exhibit A, ¶ 5).

33.     Paragraph 8 of the Non-Disclosure Agreement specifically stated that ILKB was not providing any granted or implied license under any trademark, patent, copyright, or any other intellectual property right by the disclosure of Confidential Information.   Instead, all Confidential Information shall remain the exclusive property of ILKB.  (*See*, Exhibit A, ¶¶ 7, 8).

34.     Camac also agreed to return or destroy ILKB's Confidential Information immediately upon request by ILKB.  (*See*, Exhibit A, ¶ 9).

35.     In addition, Camac acknowledged and agreed that in the event of a breach of the Non-Disclosure Agreement, including a breach by any of its employees, agents, consultants, representatives, and attorneys, ILKB will likely suffer irreparable damages that cannot be fully remedied by monetary damages.  As such, and in the event of a breach, ILKB could be entitled to seek and obtain injunctive relief against any such breach. (*See*, Exhibit A, ¶ 10).

36.     The Non-Disclosure Agreement is necessary to protect ILKB's legitimate, protectable interest in its franchise business, including but not limited to: (a) maintaining and protecting ILKB's hard-won and valuable goodwill and customer loyalty; (b) retaining customer relationships; (c) protecting ILKB's customer lists, customer identification, tax returns, and other

confidential information; and (d) preserving ILKB's ability to facilitate the operation of its established franchises.

37.     Camac agreed that New York law governs all claims arising out of or related to the Non-Disclosure Agreement.

**Breaches of the Non-Disclosure Agreement**

38.     Following execution of the Non-Disclosure Agreement, through June 2020, ILKB continued to share Confidential Information to allow Camac the ability to explore a business opportunity involving the purchase of ILKB's franchised assets.

39.     On April 20, 2020, Camac entered into a Term Sheet with ILKB for the purchase of ILKB's assets including approximately 200 ILKB franchisees, all books and records, trademark license and title and national advertising accounts of ILKB. A copy of the Term Sheet is attached hereto as **Exhibit B**.

40.     The Term Sheet was essentially an "agreement to agree" with several open, material terms and conditions needed to be agreed-upon and satisfied, including an agreement on the specific assets to be transferred, the preparation and execution of finalized sales documents, and closing.

41.     Notwithstanding these open terms, ILKB continued to divulge Confidential Information to Camac as the parties continued to work towards a common goal of transferring ILKB's franchised assets to Camac.

42.     Upon information and belief, Jessica Yarmey was heavily involved in the due diligence phase of Camac's purchase of ILKB including meetings, Zoom calls, and communication with ILKB's franchisees.  Additionally, Yarmey was privy to ILKB's confidential information as shared by Camac and Shahinian.

43.     However, it soon became clear to ILKB that Camac did not intend to honor the terms of the Term Sheet and instead, stalled any efforts to finalize the business transaction.  Rather, Camac, Shahinian, and Yarmey intended to use ILKB's confidential information to start a competing business Kickhouse.

44.     On June 11, 2020, ILKB sent a letter to Camac terminating the Term Sheet.

45.     Despite efforts by the parties to revive the business transaction and Camac's purchase of ILKB's franchised assets, no such sale or transfer occurred.

46.     Unbeknownst to ILKB, Camac started a competing business called Kickhouse using ILKB's Confidential Information in direct contravention of the Non-Disclosure Agreement. Camac never intended to purchase ILKB but instead, sought its confidential information including its 200 franchises.

47.     On July 14, 2020, Kickhouse filed papers to form a limited liability company in the State of Delaware to operate kickboxing studios under the name "Kickhouse."

48.     Moreover, on July 22, 2020, Kickhouse registered "KICK HOUSE" trademark (U.S. Registration Number 90066878) service marks, logos and derivations thereof.

49.     Upon information and belief, Kickhouse is a franchise system that offers identical services to ILKB and seeks identical customers to ILKB.

50.     As early as June 2020, Kickhouse representatives held at least three Zoom town hall meetings with prospective franchisees and invited more than 40 current ILKB franchisees in an attempt to convince them to rebrand as a Kickhouse franchise.  A transcribed copy of the three Zoom town hall meetings are attached hereto as **Exhibits C, D, and E**.

51.     Shahinian, managing member of Camac, and the same individual who signed the Non-Disclosure Agreement with ILKB, and Yarmey, Chief Executive Officer of Kickhouse,

hosted the town hall meetings.  Yarmey holds equity interest in Kickhouse, has benefited, and continues to benefit from use of ILKB's confidential information.  In fact, Yarmey was heavily involved in town hall meetings with ILKB's franchisees during the due diligence period of Camac's purchase of ILKB.   Yarmey was privy to Camac's and ILKB's communications and business transaction including ILKB's sharing of confidential information to Camac.

52.     Upon information and belief, Shahinian and Yarmey solicited ILKB's current franchises to attend the town hall meetings to rebrand as Kickhouse franchises.

53.     During the Zoom meetings, Shahinian and Yarmey introduced a business model to prospective franchisees that mirrored ILKB's Franchise Agreements, including monthly royalties of 4%, monthly marketing fees at 1%, pricing philosophy, and marketing strategies.  (*See,* Exhibits C, D and E).

54.     In fact, Shahinian and Yarmey discussed competitors in the kickboxing market and specifically mentioned ILKB during one of the Zoom calls.

55.     Shahinian also represented that Kickhouse would be willing to provide legal support for those individuals and franchises seeking to rebrand their franchise and join Kickhouse.

56.     These Zoom town hall meetings continued into July and August, and were offered with the sole intent to rebrand ILKB franchisees and convince them to join Kickhouse.  Shahinian and Yarmey also announced on the most recent August Zoom call that instructor and manager training is scheduled to begin on or about August 22, 2020.

57.     Upon information and belief, Lanier is also an equity owner in Kickhouse.

58.     Lanier has been instrumental in assisting ILKB's franchisees to terminate their relationship with ILKB, including preparing notices of termination letters, and convincing them to rebrand as Kickhouse franchisees.

59.     Despite ILKB's contractual rights with their franchisees, of which Lanier is knowledgeable considering his prior business relationship with ILKB, Lanier continues to interfere in an effort to increase the number of Kickhouse franchisees to ILKB's detriment.

**Unfair Competition and Breaches of the Non-Disclosure Agreement**

60.     Despite the clear terms in the Non-Disclosure Agreement, Defendants (1) continue to use the Confidential Information; (2) refuse to return ILKB's Confidential Information; (3) refuse to return the confidential Operations Manual; and (4) currently offer kickboxing services through Kickhouse, using ILKB's Confidential Information, in violation of the Non-Disclosure Agreement.

61.     Upon information and belief, Defendants will continue to offer kickboxing services to ILKB's customers, divert business from other ILKB-branded offices in the area, and use ILKB's confidential information to solicit and/or service ILKB's customers into the future.

62.     Camac has also failed to return the Operations Manual to ILKB, customer lists, tax returns, files, and records.

63.     Immediately following ILKB's cancellation of the Term Sheet, Defendants began advertising and providing kickboxing services through Kickhouse in violation of the Non-Disclosure Agreement.

64.     Upon information and belief, Defendants are using ILKB's confidential information, goodwill, reputation and proprietary franchise methods to solicit consumers, many of which include ILKB's current and former customers.

65.     Eric Shahinian is the registered agent and managing member of Camac and Kickhouse.  Upon information and belief, Yarmey and Lanier are equity owners and derive substantial monetary benefit from the operations of Kickhouse.

66.     ILKB did not authorize Defendants' use of its Confidential Information.

67.     Upon information and belief, Defendants currently are advertising their kickboxing services in the State of New York and throughout the United States.

68.     Upon information and belief, Defendants are providing kickboxing services in the State of New York and throughout the United States.

69.     Because of Camac's breaches of contract, ILKB has suffered pecuniary harm and irreparable damage to its hard-won customer goodwill and loyalty and has lost business opportunities, customers, profits, franchise stability, ability to sell franchises and competitive advantage.

## COUNT I
### *Breach of the Non-Disclosure Agreement Against Camac*

70.     ILKB repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

71.     The Non-Disclosure Agreement is valid and enforceable.

72.     ILKB has performed every obligation and condition required of it under the Non-Disclosure Agreement.

73.     In contravention of its duties and obligations under the Non-Disclosure Agreement, Camac, during and following the parties' continued negotiations to transfer ILKB's franchised assets, breached its by, *inter alia*:

> a.     Disclosing Confidential Information to third-parties including but not limited to ILKB's books and records, Operating Manual, trademark license, customer lists, and advertising accounts;

> b.     Using the Confidential Information obtained from ILKB during the due diligence phase of the parties' negotiations to operate a competing franchise system called "Kickhouse;"

11

c.      Failing to return or destroy such Confidential Information obtained from ILKB during the due diligence phase of the parties' negotiations including prior to and following execution of the Term Sheet;

d.      Failing to return to ILKB the confidential Operations Manual and other Confidential Information revealed by ILKB to Camac; and

e.      Disclosing ILKB's confidential information, including customer information and proprietary operation and marketing methods to third parties for the purpose of operating a competing business.

74.     Each of the foregoing are material breaches of the Non-Disclosure Agreement.

75.     As a direct and proximate result of these breaches, ILKB has incurred, and will continue to incur, substantial losses, fees, and expenses for which Camac is liable.

76.     As a result of Camac's past, present, and potential breaches, ILKB has suffered, and will continue to suffer, actual, substantial, and irreparable damage, including, but not limited to: (a) loss of customer goodwill and loyalty; (b) loss of business opportunities and relationships; (c) loss of customers; (d) loss of profits; (e) loss of franchise system stability; (f) loss of ability to sell other franchises; (g) loss of value in confidential business information; (h) loss of competitive advantage; (i) attorneys' fees and costs; and (j) monetary damages associated with unpaid amounts due, owing and accruing to ILKB.

77.     ILKB has been and will be irreparably harmed by Camac's actions, and monetary damages are an insufficient remedy in that they can only potentially quantify a limited loss of customers and franchisees, but cannot take into account the continuing irreparable damage to the value of ILKB's confidential information, goodwill, customer loyalty, and its ability to sell franchises, all of which are caused by Camac's ongoing violations.

78.     Upon information and belief, Camac will continue to breach its obligations of the Non-Disclosure Agreement unless its wrongful conduct is enjoined.

## COUNT II
### Tortious Interference with Contract Against Defendants

79.     ILKB repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

80.     The Non-Disclosure Agreement is valid and enforceable.

81.     Defendants, including Shahinian, Yarmey and Lanier, knew of the existence of the Franchise Agreements ILKB entered into with approximately 200 of its franchisees. These Franchise Agreements were divulged to Camac and Shaninian during the due diligence phase of the parties' negotiations and were to be kept strictly confidential pursuant to the Non-Disclosure Agreement.

82.     Despite these unequivocal terms, Defendants have harmed and continue to harm ILKB by luring ILKB's franchisees to breach their respective Franchise Agreements and join "Kickhouse." Kickhouse, through Lanier, continues to provide free legal services to ILKB franchisees who wish to terminate their valid and enforceable Franchise Agreements with ILKB, and rebrand as a Kickhouse franchise.

83.     Defendants induced ILKB's franchises to breach various provisions of the Franchise Agreements, including, but not limited to their contractual obligations to pay royalties and marketing fees, notice requirements, and post-termination obligations.

84.     As a result of Defendants' tortious conduct, ILKB franchisees had breached and continue to breach their respective the Franchise Agreements with ILKB in an effort to join "Kickhouse."

85.     Defendants' tortious interference has caused ILKB to suffer irreparable injury and ILKB will continue to suffer irreparable injury unless they are enjoined from further tortious interference with ILKB's Franchise Agreements.

86.     As a direct and proximate result of Defendants' tortious interference, ILKB has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, compensatory damages, consequential damages, and disgorgement of Camac's profits.

## COUNT III
### Violation of Defend Trade Secrets Act Against All Defendants

87.     ILKB incorporates all previous paragraphs as though fully set forth herein verbatim.

88.     The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, provides a private civil action for the misappropriation of a trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce.

89.     ILKB owns numerous trade secrets, including but not limited to, its Operations Manual, training manuals, training programs, marketing strategies, marketing programs, and customer lists.

90.     Each of ILKB's trade secrets derives independent economic value from not being generally known to and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

91.     ILKB's trade secrets are not readily ascertainable by the public as they are disclosed only to franchisees in the operation of a franchised business pursuant to a franchise agreement.

92.     During the due diligence phase of the parties' negotiation of the Non-Disclosure Agreement and Term Sheet, ILKB's trade secrets were disclosed to Camac for the sole purpose of

exploring a potential business transaction involving Camac's purchase of certain ILKB franchised assets.

93.     ILKB has taken extensive measures to preserve and protect these trade secrets for the purpose of maintaining its competitive advantage in the marketplace.

94.     The Non-Disclosure Agreement explicitly provides for the protection of such trade secrets, including requiring the return or destruction of such confidential information to ILKB upon termination of the Non-Disclosure Agreement, requiring Camac and its agents, employees, representatives and attorneys to maintain the confidentiality of the information, and requiring Camac and its agents, employees, representatives and attorneys to never use the information for any purpose other than as stated in the Non-Disclosure Agreement.

95.     ILKB required and Camac agreed that upon duration of the Non-Disclosure Agreement, and following its termination, it would never use, disclose, or permit the use or disclosure of ILKB's trade secrets in any manner whatsoever.

96.     Without consent from ILKB, Defendants used the business know-how, customer lists, and customer contact information that Camac obtained from ILKB during the due diligence phase to obtain business for themselves and eventual development and operation of "Kickhouse," thereby misappropriating ILKB's trade secrets.

97.     Upon information and belief, Defendants used and are utilizing ILKB's confidential system and materials for their own benefit and profit and ILKB has not and would not consent to or authorize such use.

98.     Defendants intentionally and without ILKB's permission or authorization misappropriated and/or disclosed ILKB's trade secrets for their own economic benefit and with

the intention and knowledge that their conduct would injure ILKB by, for example, causing ILKB to lose any customers and franchisees successfully solicited by Defendants.

99.     As a direct and proximate result of Defendants' willful, improper, and unlawful disclosure and Defendants' willful, improper, and unlawful use of ILKB's trade secrets, ILKB has suffered and will continue to suffer irreparable injury.

100.    Pursuant to 18 U.S.C. § 1836(b)(3)(A), Defendants' actual and threatened use and misappropriation of ILKB's trade secrets should be enjoined from further disclosure or use of ILKB's trade secrets.

101.    Defendants' conduct in misappropriating ILKB's trade secrets was and continues to be willful and malicious - warranting an award of exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C) and an award of reasonable attorneys' fees in accordance with 18 U.S.C. § 1836(b)(3)(D).

## COUNT IV
### *Unjust Enrichment/Restitution Against Defendants*

102.    ILKB repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

103.    Defendants have knowingly and intentionally misappropriated ILKB's confidential information, including franchise and customer lists and ILKB's confidential and proprietary business system as set forth in its Operations Manual, in furtherance of their operation of the competing business "Kickhouse."

104.    Defendants have used and continue to use the confidential information divulged by ILKB pursuant to the Non-Disclosure Agreement and Term Sheet, including, but not limited to the Operations Manual, training manuals, training programs, marketing strategies, marketing programs, and customer lists to lure ILKB franchises to join "Kickhouse."

105.     Upon information and belief, Kickhouse has solicited ILKB's franchises, interfered with ILKB's Franchise Agreements with those respective franchises, and successfully brought them over to Kickhouse to compete with ILKB.

106.     Upon information and belief, Kickhouse continues to operate using ILKB's Operations Manual, training manuals, training programs, marketing strategies, marketing programs, and customer lists.

107.     In equity and fairness, Defendants are liable to ILKB for any amounts collected from the improper and illegal use of ILKB's Confidential Information.

108.     Defendants knew that ILKB expected to be compensated, and that Defendants should have compensated ILKB, for use of ILKB's confidential information, franchise and customer lists, reputation and good will to offer kickboxing services.

109.     Defendants knowingly retain these benefits, to which they are not rightfully entitled, at the expense and to the damage of ILKB.

110.     There is no adequate remedy at law that will protect ILKB from continued irreparable injury or fully compensate it for the damage caused by Defendants' wrongful conduct.

<u>**COUNT V**</u>
***Request for Preliminary Injunction Against Defendants***

111.     ILKB repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

112.     ILKB's application for injunctive relief is authorized by Fed. R. Civ. P. 65.

113.     Pursuant to Paragraph 10 of the Non-disclosure Agreement, Camac acknowledged and agreed that "in the event of a breach of the Non-Disclosure Agreement, including a breach by any of its employees, agents, consultants, representatives, and attorneys, ILKB will likely suffer irreparable damages that cannot be fully remedied by monetary damages.  As such, and in the

17

event of a breach, ILKB would be entitled to seek and obtain injunctive relief against any such breach." (*See*, Exhibit A, ¶ 10).

114. Despite this acknowledgement, Defendants continued to offer competing kickboxing services and have disclosed and are using ILKB's Confidential Information as a means to accomplish their unlawful competition.

115. Upon information and belief, Defendants each and jointly will continue to offer kickboxing services in contravention of Camac's duties and obligations under the Non-Disclosure Agreement.

116. As a result of Defendants' unlawful acts, ILKB has been irreparably harmed and will continue to suffer irreparable harm.

117. For the foregoing reasons, ILKB respectfully requests that the Court issue a preliminary injunction against Defendants:

    a. Ordering Defendants to return all Operations Manuals, customer files, customer lists and any other confidential information that came into Camac and/or Kickhouse's possession during the due diligence phase or thereafter;

    b. Enjoining Defendants from using any of ILKB's confidential information;

    c. Enjoining Defendants from diverting or attempting to divert any customer or business from ILKB or to solicit or endeavor to obtain the business of any person who shall have been a customer of ILKB;

    d. Preserving the *status quo* and restricting Defendants from operating a competing kickboxing business (Kickhouse); and

    e. Enjoining Kickhouse, Shahinian, Yarmey and Lanier from interfering with Camac's obligations under the Non-Disclosure Agreement.

118. ILKB will likely succeed on the merits on its claims, as Camac has openly and actively breached the Non-Disclosure Agreement; Defendants are openly and actively tortiously interfering with ILKB's franchises' performance of their obligations under their

respective Franchise Agreements; and Defendants are using ILKB's confidential information and trade secrets to their benefit and detriment of ILKB.

119.     Irreparable harm will result if a preliminary injunction is not issued because Defendants will continue to use ILKB's confidential information to unlawfully compete with ILKB; Defendants will continue to erode ILKB's goodwill and reputation by offering knock-off kickboxing services using ILKB's confidential information and trade secrets; and Kickhouse will continue to tortiously interfere with the Camac's obligations of the Non-Disclosure Agreement, which will cause irreparable and irreversible harm to the goodwill and reputation that ILKB has spent significant time and money establishing.

120.     ILKB has no adequate remedy at law because Defendants refuse to cease their unlawful conduct.

121.     The injury to ILKB outweighs any injury that would be sustained by Defendants collectively, and each of them, as a result of the requested injunctive relief.

122.     Injunctive relief will not adversely affect the public interest.

123.     Defendants have been or are being served with notice of this application for injunctive relief.

### COUNT VII
### *Request for Permanent Injunction Against Defendants*

124.     ILKB repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

125.     After a trial on the merits or a final judgment, ILKB asks the Court to convert any preliminary injunction as specified above into a permanent injunction.

126.     ILKB has joined all indispensable parties pursuant to Fed. R. Civ. 19.

### PRAYER FOR RELIEF

WHEREFORE, ILKB prays for judgment against Defendants as follows:

1.      For the following preliminary and permanent injunctive relief:

     a.      Ordering Defendants to return all Operations Manuals, customer files, customer lists and any other confidential information that came into Camac and/or Kickhouse's possession during the due diligence phase or thereafter;

     b.      Enjoining Defendants from using any of ILKB's confidential information;

     c.      Preserving the *status quo* and restricting Defendants from operating a competing kickboxing business;

     d.      Enjoining Defendants from diverting or attempting to divert any customer or business from ILKB or to solicit or endeavor to obtain the business of any person who shall have been a customer of ILKB; and

     e.      Enjoining Kickhouse, Shahinian, Yarmey and Lanier from interfering with Camac's obligations under the Non-Disclosure Agreement.

2.      For an accounting of Kickhouse's revenues and profits for all services provided since July 14, 2020;

3.      For damages resulting from Defendants' violations of the Defend Trade Secrets Act, in an amount to be proven at trial;

4.      For attorneys' fees and costs, in an amount to be proven at trial;

5.      For pre- and post-judgment interest; and

6.      For such other relief as the Court deems just and appropriate.

Respectfully submitted this 19th day of August, 2020.

               **GORDON REES SCULLY MANSUKHANI, LLP**
               *Attorneys for Plaintiff*
               *ILKB, LLC*

               By: _/s/ Peter G. Siachos_
                     Peter G. Siachos, Esq.
                     Matthew P. Gallo, Esq.

               One Battery Park Plaza, 28th Floor
               New York, NY 10004
               Telephone: (973) 549-2500
               Email: psiachos@grsm.com

Telephone: (973) 549-2500
Email: psiachos@grsm.com

## VERIFICATION

DANIEL CASTELLINI does hereby verify and state pursuant to 28 U.S.C. § 1746:

I am a President for ILKB, LLC ("ILKB"). I have read the foregoing Verified Complaint and know the contents thereof and state the allegations are true. I base this Verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief and, as to those matters, I believe them to be true. The grounds of my knowledge, information, and belief are derived from my position as President of ILKB, my personal involvement in the event underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of ILKB's records and conversations with ILKB's employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _8-18-20_ day of August, 2020.

_____
DANIEL CASTELLINI

21